IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL CASE NO. 3:21-cv-00082-MOC
CRIMINAL CASE NO. 3:15-cr-00225-MOC-DCK-1

| | |
|---|---|
| PATRICK EMANUAL SUTHERLAND, ) ) Petitioner, ) ) vs. ) ) UNITED STATES OF AMERICA, ) ) Respondent. ) _____ ) | **MEMORANDUM OF DECISION AND ORDER** |

**THIS MATTER** is before the Court on Petitioner's Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255 [CV Doc. 1],[1] Petitioner's Petition for Writ of Coram Nobis [CV Doc. 3], the Government's Motion to Dismiss Petitioner's Motion to Vacate [CV Doc. 9], and Petitioner's Motion to Strike the Government's Surreply [CV Doc. 12].

**I.    BACKGROUND**

Petitioner Patrick Emanual Sutherland ("Petitioner") was an experienced businessman and actuary. He had a master's degree in Actuarial Science and Finance and an undergraduate degree in Mathematics, Economics, and Computer Science. [CR Doc. 57 at ¶¶ 6, 63: Presentence Investigation Report (PSR)]. Petitioner was a Registered General Securities and Financial Operations Principal with the National Association of Securities Dealers and was a Registered Investment Advisory. [Id. at ¶ 6]. He had more than 20 years' experience in insurance, banking, securities, and financial services industries. He was the owner, principal, director, and executive

---

[1] Citations to the record herein contain the relevant document number referenced preceded by either the letters "CV," denoting that the document is listed on the docket in the civil case file number 3:21-cv-00082-MOC, or the letters "CR," denoting that the document is listed on the docket in the criminal case file number 3:15-cr-00225-MOC-DCK-1.

of numerous businesses, including Insigne, Inc. ("Insigne"); XYZ Entertainment, LLC ("XYZ"); Kyrotech Holdings ("Kryotech"); and Innovation Partners, LLC ("Innovation Partners"). [Id. at ¶ 7].

Petitioner's work included deals with offshore insurance companies. He used a Bermuda company, Stewart Technology Services Limited (STS), as his primary intermediary to receive offshore commissions and fees. [Id. at ¶ 8]. Although Petitioner's sister, Beverly Stewart, was listed as the President and owner of STS, it was really Petitioner's company. [Id. at ¶ 10]. Petitioner received the statements for STS's Bermuda bank account at his Charlotte, North Carolina, residence; he was the primary contact for STS's Bermuda brokerage account; he was listed as a director and Vice President of STS and was a "customer delegate" with access to the business internet banking for the STS Bermuda bank account; and he and his wife, Yanique Lawrence, were authorized signatories on that account. [Id.]. Petitioner, his wife, and his business entities had 36 different domestic financial accounts. [Id. at ¶ 11]. Between 2007 and 2010, over $2.5 million in deposits were made to these accounts. [Id. at ¶ 12]. Approximately $2 million of those deposits were wire transfers from STS. [Id. at ¶ 13].

Some of the wire transfers came from funds deposited into STS that were fees or commissions on insurance contracts. Some came from interest earned or the sale of securities from STS's brokerage account. And some originated from lines of credit purportedly obtained by Stewart. [Id. at ¶ 13]. Many of the wire transfers included descriptions, such as commissions, consulting fees, and service fees, that identified them as taxable receipts. [Id. at ¶ 14]. Despite this, the general ledgers for Insigne, XYZ, and Kryotech frequently mischaracterized these receipts as nontaxable by falsely calling them capital contributions and loans. [Id. at ¶ 15]. Petitioner and STS "treated these wire transfers in inconsistent manners that provided Petitioner tax advantages."

2

<u>United States v. Sutherland</u>, 921 F.3d 421, 424 (4th Cir. 2019), <u>cert.</u> <u>denied</u>, 140 S.Ct. 1106 (2020).

The Fourth Circuit explained:

> Sutherland treated the vast majority of wire transfers from STS to his companies as bona fide loans or capital contributions, which ordinarily are not taxable income for their recipient. By contrast, STS treated nearly all of the wire transfers as expenses that had been paid to Sutherland. If the wire transfers were in fact expenses paid to Sutherland, as STS recorded them, then Sutherland and his companies should have reported the wire transfers as taxable income. Far from reporting them as income, however, Sutherland either treated the transfers from STS to him and his wife as bona fide loans or failed to account for them in his general ledger altogether. In the end, Sutherland did not report the $2.1 million as income on his tax returns.
>
> Sutherland's treatment of the STS transfers mirrored his treatment of other income. Indeed, the defendant seemed to think that marking income as a capital contribution or loan was a foolproof scheme. For example, three Sutherland companies—Insigne Consulting, Insigne, Inc., and XYZ Entertainment—sent almost $42,000 to Kryotech Holdings, another Sutherland company, between 2007 and 2009. The paying companies recorded each transfer as a non-taxable marketing expense, while Kryotech treated the payments as non-taxable capital contributions. The net result: none of Sutherland's companies would pay taxes on those funds. Similarly, Insigne, Inc., received more than $125,000 in taxable fees from another firm, Global Financial Synergies, between 2006 and 2010— yet Sutherland described the majority of them as nontaxable capital contributions. Come tax day, despite the millions of dollars flowing through his accounts, Sutherland reported just $88,979 of income in 2008; $16,669 in 2009; and $72, 415 in 2010.

<u>Id.</u> On those same tax returns, Petitioner also failed to report, as required, his interest in or signatory authority over a financial account in a foreign country. [CR Doc. 57 at ¶ 18].

In April 2012, a grand jury in the Western District of North Carolina issued subpoenas seeking the records of Petitioner's companies. [CR Doc. 79 at 47: Trial Tr.[2]]. Three months later, Petitioner's attorney sent the United States Attorney's Office a letter attempting "to explain away

---

[2] Docket Nos. 77 through 82 are the trial transcripts in this matter.

a large number of transactions related to the subpoenaed materials." Sutherland, 921 F.3d at 424. The letter stated that STS was formed in the early 2000s to develop, manufacture, license, sell and support products and database systems for trust and insurance companies and investment managers. [CR Doc. 79 at 55]. The letter also stated that Petitioner had served on the STS board of directors, but that he had no ownership interest in and was not employed by STS. [Id. at 56].

Petitioner's attorney represented that Stewart had agreed to lend Petitioner's companies funds until his businesses became profitable and that "[a]ll loans from STS to … [Petitioner] were contemporaneously documented by written and fully-executed loan agreements." [Id.]. Pursuant to those agreements, Petitioner agreed to pay 6% interest and 20% of the proceeds received from the sale of any entity in which Petitioner had an ownership interest. [Id.]. The agreement provided for full repayment of the loans plus interest seven years from the end of the calendar year in which the loan was made. [Id.].

Petitioner's attorney stated that between 2007 and 2011, Stewart loaned Petitioner $2,052,925. [Id. at 56-57]. He attached loan agreements purportedly signed by Stewart and Petitioner and executed in Union County, North Carolina, in 2007, 2008, 2009, 2010, 2011, and 2012. Each of the six agreements independently granted Stewart twenty percent of the sale of any of Petitioner's businesses. Therefore, when considered together, they provided that Stewart would receive 120% of the proceeds from the sale of any of Petitioner's businesses. [Id. at 64]. Balance sheets for STS, reflecting assets and liabilities as of December 31, 2008, and as of December 31, 2010, purportedly signed by Stewart and Petitioner, did not reflect any loan from STS to Petitioner or his companies as an asset. [Id. at 41-42]. Petitioner's attorney also submitted documents purporting to transfer to STS an interest in Petitioner's properties in St. Lucia and Brevard, North Carolina, and in two properties in Jamaica, including Stewart's home address. [Id. at 66-70]. Both

4

Stewart and Petitioner purportedly signed these property transfers as they purportedly signed the others.  [Id. at 67-68].

The grand jury indicted Petitioner, charging him with three counts of filing a false tax return, 26 U.S.C. § 7206(1), for the years 2008, 2009, and 2010 (Counts One, Two, and Three), and one count of obstructing or attempting to obstruct, influence, and impede the grand jury and aiding and abetting the same, 18 U.S.C. §§ 1512(c)(2) and 2 (Count Four).  [CR Doc. 3: Bill of Indictment].  The Indictment alleged that between 2007 and 2010, Petitioner and his companies received deposits exceeding $2.5 million and underreported his income by more than $1.5 million and that Petitioner's personal expenditures "far exceeded his total income" as reported on his individual tax returns.  [Id.]. The Indictment also alleged that in 2008 to 2010 Petitioner failed to report, as required, his interest in or authority over a financial account in a foreign country.  [Id. at 3].  As to the obstruction count, the Indictment alleged that Petitioner had attempted to obstruct a federal investigation by providing fraudulent documents, including purported loan agreements between STS and Petitioner, to the grand jury.  [Id. at 5].  Petitioner retained counsel and was represented by four attorneys at trial.  [CR Docs. 1, 13; 9/21/2015 Docket Entry].

At trial, the United States presented evidence that in 2007, 2008, and 2009, Stewart attended a community college in Jamaica, studying hospitality and tourism management and worked in the United States over the summer.  [CR Doc. 78 at 32, 36-37, 40, 51; CR Doc. 81 at 89-90].  "Despite allegedly owning a multi-million dollar business [STS], Stewart worked at the Best Western hotel in Cody, Wyoming for less than $10 an hour," and, at one point, "was unable to pay a $600 fee without her hotel earnings."  Sutherland, 921 F.3d at 424.  In her application for employment, Stewart did not list STS as part of her "[o]ther activities and experience."  [CR Doc. 78 at 54].

> The evidence at trial not only outlined [Sutherland's] financial misdeeds …, but also demonstrated that the loan documents Sutherland sent to the U.S. Attorney's office in July 2012 had been fabricated. Read together, the documents implausibly pledged that Sutherland would give STS 120% of the proceeds of any sale of his businesses. While the documents had purportedly been signed by Sutherland's sister, evidence revealed that Sutherland commonly signed documents for her. The loan documents from Sutherland, moreover, conflicted with internal accounting documents from STS (the purported lender). Finally, the government introduced documents in which Sutherland claimed to have made loan payments by transferring interests in his other businesses to STS. But these related documents were bogus and backdated. A document supposedly signed in 2011, for example, described how Sutherland's businesses had "received loans from [STS] in 2011, 2012, and 2013." J.A. 1333. Legitimate documents do not reference potential future transactions in the past tense, just a bona fide loans to not require fake payment trails.

Sutherland, 921 F.3d at 424-25.

Michael Jones, Petitioner's business partner from 1999 until 2008 and a native of Jamaica, testified at trial about the companies he and Petitioner formed, their decision to form STS to act as an insurance intermediary in Bermuda, and the sources of commissions paid to their companies. [CR Doc. 80 at 62, 64-67, 74-76, 78-80]. Jones testified that Petitioner was "the primary expert in … offshore insurance" among their collaborators. [Id. at 79]. When asked what relationship Stewart had with STS, Jones replied, "She had none." [Id. at 81]. Jones explained that he traveled to Bermuda with Petitioner on three occasions, interacting and working with representatives from companies they worked with and Stewart "was never part of any conversation." [Id.].

According to Jones, the companies he and Sutherland operated received commissions from the sale of their insurance products. [Id. at 74]. Jones testified that Petitioner's brother worked for Petitioner and paid commissions to collaborators in accordance with their contracts. Petitioner, however, did most of the bookkeeping and answered financial questions about the businesses. [Id.

6

at 76-77]. Jones testified that Petitioner sent emails under his own name, Stewart's name, and his brother's name. [Id. at 112].

Jim Price, owner of a company that facilitated the sale of insurance policies in Bermuda, first met Petitioner in 2005. [Id. at 214]. Price testified that Stewart signed contracts between STS and Price's company but that he never met her. [Id. at 222, 225-26]. Price also testified that when he needed Stewart to sign a contract or other documents, he sent the documents to Stewart through Petitioner because he was told [Stewart] traveled all the time" in Europe, selling software to offshore companies. [Id. at 250, 254-260]. Some of these documents were ostensibly signed by Stewart in Charlotte during one of the summers she was working at the Best Western in Cody, Wyoming. [CR Doc. 78 at 36-37; CR Doc. 80 at 257-58].

Peter Barnett, the managing director of Transamerica Life between 2005 and 2010, testified that Transamerica Life contracted with STS to represent clients from the United States who wanted to buy insurance. [CR Doc. 80 at 177, 180, 195]. Transamerica Life paid commissions to STS on the policies STS helped facilitate. [Id. at 182, 191-92]. Barnett testified that he negotiated with Petitioner and that, while he had seen Stewart's name on documents between STS and Transamerica Life, he never met Stewart or spoke with her. [Id. at 186-87].

Doug Boik, owner of an information-technology consulting company that provide website development, internet marketing, and corporate email services to Petitioner and his companies, testified that he worked with Petitioner on technology matters related to STS. [CR Doc. 79 at 141-48, 160]. Boik testified that he assumed that STS was in Charlotte because he dealt only with Petitioner from when Boik began providing services to STS in 2007 until 2014 or so, when Stewart became his billing contact for STS. [Id. at 142-43, 174].

Agent Linda Polk of the Internal Revenue Service ("IRS") assisted in the investigation of Petitioner's case. She testified about financial records for Petitioner and his business entities. [CR Doc. 81 at 113]. Polk testified that she reviewed Petitioner's business ledgers and summarized how various transactions were recorded. [Id. at 117-18]. Some transactions between STS and Petitioner's other companies were described as "capital contributions." [Id. at 118]. Polk testified that capital contributions and bona fide loans are not taxable to the recipient. [Id. at 118-19, 198]. Polk further testified that more than $45,000 of fees and rent paid by Innovation Partners to Insigne was not treated as income to Insigne. [Id. at 140-41]. Polk also testified that $66,376 of income to Petitioner from sources other than STS was not treated as income on Petitioner's 2008 tax return. [Id. at 149]. Polk testified that almost $50,000 that Petitioner received was not reported as income on Petitioner's 2009 federal tax return, and that more than $39,000 that Petitioner received was not treated as income on Petitioner's 2010 federal tax return. [Id. at 150-51].

The defense called five witnesses. [CR Doc. 81 at 215, 237, 248, 257; CR Doc. 82 at 6]. Peter Moison, the president of CastleRe Insurance Company, a Bermuda company, testified regarding Petitioner's expertise and experience in the insurance field, as well as his reputation for honesty. [CR Doc. 81 at 216-17]. Moison also testified that his company's payments went to Innovation Partners, not STS. [Id. at 220]. Gerald Nowotny, an attorney and business owner, testified that he had worked with Petitioner and referred clients to him, and that Petitioner had an excellent reputation for honesty. [Id. at 237-44]. Sally Gilliam, a due diligence consultant with Wells Fargo, testified that she had previously worked at Innovation Partners as a compliance associate and that there were nine employees working there when she left. [Id. at 249].

The defense prepared a summary chart of credit card accounts and balances for four accounts, one for Petitioner, one in his name for Insigne, and two for his wife. [CR Doc. 81 at

8

Case 3:21-cv-00082-MOC   Document 15   Filed 09/10/21   Page 8 of 20

257-58]. The exhibit was admitted through the testimony of Marissa Mugan, a paralegal, and showed large balances were carried on the cards. [Id. at 257-60]. Finally, a business valuation expert, Bradford Taylor, testified regarding the value of Innovation Partners and Insigne Advisor Consulting at the time a percentage of those companies was transferred to STS as alleged repayment of the loans. [Doc. 82 at 6-7, 14, 17]. At the end of 2011, the total value was $10,000; in 2012 it was $250,000; in 2013 it was $720,000; in 2014 it was $1.45 million; and by 2016 it was $7.2 million. [Id. at 25]. Petitioner did not testify. [Id. at 43-44].

The jury found Petitioner guilty on all four counts. [CR Doc. 44: Jury Verdict].

Petitioner was sentenced on June 21, 2017. [CR Doc. 84 at 1: Sentencing Tr.]. At sentencing, Petitioner sought to decrease the loss calculation. He argued that the "books mischaracterized a whole bunch of things to the benefit and to the detriment of Mr. Sutherland." [Id. at 6]. Jane Frazier, a managing member of a public accounting firm with a B.S. in accounting, testified for Petitioner. [Id. at 9-10]. She testified that she found other unreported income based on an interview with Petitioner and documents that he provided, documents from his law firm, and the Government's exhibits. [Id. at 12-14, 16]. Frazier testified that she had not included certain money as income because it was her "understanding" that certain transfers were from a line of credit at STS. [Id. at 15]. She included deductions for business expenses that were paid using Petitioner's personal credit care. [Id. at 17-18]. Frazier testified that she calculated a loss of $283,438 for 2007, which she carried forward to 2008. [Id. at 24]. She determined that there was a policy with United Healthcare that was in the name of Kryotech Holdings. [Id. at 25-26]. Although payments were made for that policy from other entities, she eliminated the deduction from there and included it under Kryotech because the policy was in that company name. [Id. at

26]. Based on her calculations, Frazier concluded that Petitioner owed no additional tax for 2008, that he owed $2,530 for 2009, and that he owed $32,943 for 2010. [Id. at 28-29].

Frazier admitted that Petitioner provided much of the information regarding what charges were for business expenses, that she did not have receipts for everything, and that she did not audit all the items in QuickBooks. [Id. at 34-35, 49]. Her calculations showed hundreds of thousands of dollars of business expenses that were all cash. [Id. at 36]. She did not have all the bank records underlying the transactions or even all of Sutherland's accounts. [Id. at 39-45]. She allowed business expenses of $5,000-$6,000 a year for grocery store purchases based on Petitioner's representations that they were business expenses. [Id. at 49-50]. Frazier deducted anything that was vehicle related based on Petitioner's representation that the expenses were business related, although there was no mileage log. [Id. at 52].

The Government, on the other hand, argued that the records were unreliable and "just don't make sense." The Government argued that Petitioner asked the Court to include business expenses from companies that appeared nowhere on Petitioner's tax returns in calculating loss. [Id. at 62-63]. The Government also stated that it was very conservative in its estimates due to the lack of records supporting different expenses. [Id. at 61-62].

The Court found that the self-reported information from Petitioner was not reliable and that it was "just not believable" that "you can live this lifestyle off of that little money." [Id. at 63-64]. The Court found that the Guidelines correctly stated the loss amount. [Id. at 64]. The Court varied downward and sentenced Petitioner to 33 months' imprisonment on all counts, to be served concurrently, and one year of supervised release on the tax counts and three years of supervised release for the obstruction count, to run concurrently. [Id. at 90].

10

Petitioner appealed, [CR Doc. 72], and the Fourth Circuit affirmed his conviction on April 22, 2019. Sutherland, 921 F.3d at 421, cert. denied, 140 S.Ct. 1106 (2020). Petitioner was released from prison on March 22, 2019. Petitioner's one-year term of supervised release on Counts One through Three has been discharged, but Petitioner remains on supervised release on his obstruction of justice charge. In November 2020, this Court denied Petitioner's motion for early termination of his term of supervised release on this charge. [CR Docs. 88, 94]. On February 24, 2021, Petitioner filed the pending § 2255 motion to vacate and petition for writ of coram nobis. [CV Docs. 1, 3]. In his § 2255 motion, Petitioner argues that he received ineffective assistance of counsel because his attorney did not call his brother, Phillip Sutherland, as a witness at trial and did not call an expert in accounting and taxes to testify at trial, citing the expert testimony he offered at sentencing. [CV Doc. 1 at 19, 23]. Petitioner also petitions the Court for writ of coram nobis to vacate his convictions on Counts One through Three on essentially the same grounds. [CV Doc. 3].

The matter is now ripe for disposition.

## II. STANDARD OF REVIEW

### A. Motion to Vacate

A federal prisoner claiming that his "sentence was imposed in violation of the Constitution or the laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a).

Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that courts are to promptly examine motions to vacate, along with "any attached exhibits and the record of prior

11

Case 3:21-cv-00082-MOC   Document 15   Filed 09/10/21   Page 11 of 20

proceedings . . ." in order to determine whether the petitioner is entitled to any relief on the claims set forth therein. After examining the record in this matter, the Court finds that the motion to vacate can be resolved without an evidentiary hearing based on the record and governing case law. See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

### B. Coram Nobis

The All Writs Act, 28 U.S.C. § 1651(a), authorizes the Court to hear petitions for a writ of error coram nobis. United States v. Morgan, 346 U.S. 502, 512 (1954). A coram nobis petition is "of the same general character as one under 28 U.S.C. § 2255," but is available to petitioners who are no longer "in custody" and cannot seek habeas relief under § 2255 or §2241. Morgan, 346 U.S. 506 n. 4. It is a remedy of last resort and is "narrowly limited to extraordinary cases presenting circumstances compelling its use to achieve justice." Kornse v. United States, No. 1:19-cv-00290-MR, 2019 WL 6169808, at *2 (W.D.N.C. Nov. 19, 2019) (citations and internal quotation marks omitted). "[J]udgment finality is not to be lightly cast aside; and courts must be cautious so that the extraordinary remedy of *coram nobis* issues only in extreme cases." United States v. Denedo, 556 U.S. 904, 916 (2009).

A petitioner for coram nobis is not entitled to relief unless he can meet his burden to prove four elements: "(1) a more usual remedy is not available; (2) valid reasons exist for not attacking the conviction earlier; (3) adverse consequences exist from the conviction sufficient to satisfy the case or controversy requirement of Article III; and (4) the error is of the most fundamental character." United States v. Akinsade, 686 F.3d 248, 252 (4th Cir. 2012) (citation omitted). This is a "substantial burden," even "'exceeding that of an ordinary habeas petitioner.'" Hall v. United States, No. 3:12-cv-762, 2012 WL 5902432, at *3 (W.D.N.C. 2012) (quoting Akinsade, 686 F.3d

at 261 (Traxler, C.J., dissenting)). Whether to grant the writ is ultimately a matter of this Court's discretion. See Akinsade, 686 F.3d at 252 (reviewing denial of writ for abuse of discretion).

### III. DISCUSSION

The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense. See U.S. Const. Amend. VI. To show ineffective assistance of counsel, Petitioner must first establish deficient performance by counsel and, second, that the deficient performance prejudiced him. See Strickland v. Washington, 466 U.S. 668, 687-88 (1984). The deficiency prong turns on whether "counsel's representation fell below an objective standard of reasonableness ... under prevailing professional norms." Id. at 688. A reviewing court "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." Harrington v. Richter, 562 U.S. 86, 104 (2011) (quoting Strickland, 466 U.S. at 689). The Strickland standard is difficult to satisfy in that the "Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." See Yarborough v. Gentry, 540 U.S. 1, 8 (2003).

The prejudice prong asks whether counsel's deficiency affected the judgment. See Strickland, 466 U.S. at 691. A petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. In considering the prejudice prong of the analysis, a court cannot grant relief solely because the outcome would have been different absent counsel's deficient performance, but rather, it "can only grant relief under . . . Strickland if the 'result of the proceeding was fundamentally unfair or unreliable.'" Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998) (quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)). Under these circumstances, the petitioner "bears the burden of

affirmatively proving prejudice." Bowie v. Branker, 512 F.3d 112, 120 (4th Cir. 2008). If the petitioner fails to meet this burden, a reviewing court need not even consider the performance prong. Strickland, 466 U.S. at 670.

"The decision whether to call a particular witness is almost always strategic, requiring a balancing of the benefits and risks of the anticipated testimony." Jackson v. United States, 638 F. Supp. 2d 514, 550 (W.D.N.C. 2009) (quoting Horton. Allen, 370 F.3d 75, 86 (1st Cir. 2004)). Risks include a witness not testifying as anticipated, witness whose character or demeanor might be viewed unfavorably by the jury, and eliciting testimony that could "prompt jurors to draw inferences unfavorable to the accused." Id. Strategic decisions of counsel are entitled to "enormous defendant." United States v. Terry, 366 F.3d 312, 317 (internal quotation and citation omitted); Strickland, 466 U.S. at 669. To establish ineffective assistance, counsel's decision not to call a witness must be "so patently unreasonable that no competent attorney would have made it." Jackson, 683 F. Supp. 2d at 550 (internal citation and quotation omitted).

### A. Motion to Vacate

Petitioner moves to vacate his convictions on all four counts of conviction based on ineffective assistance of counsel. Section 2255 requires that a prisoner be in custody at the time he files his motion to vacate. See 28 U.S.C. § 2255; Carafas v. LaVallee, 391 U.S. 234, 238 (1968). Where a petitioner's sentence, including any term of supervised release, has been fully discharged, the petitioner is no longer in custody. Maleng v. Cook, 490 U.S. 488, 491-92 (1989). "[O]nce the sentence imposed for a conviction has completely expired, the collateral consequences of that conviction are not themselves sufficient to render an individual 'in custody' for the purposes of a habeas attack upon it." Id. at 492.

Petitioner is no longer in custody on his convictions for Counts One through Three. His term of supervised release on these convictions was discharged on March 22, 2020. He did not file the pending § 2255 motion until over one year later. Relief under § 2255 for these convictions is, therefore, unavailable. Relief is proper, if at all, through the writ of coram nobis, which Petitioner concedes in his petition therefore. [CV Doc. 3 at 12 ("[Petitioner] is not eligible for habeas relief under 28 U.S.C.§ 2255" on Counts One through Three.")].

The Court, therefore, considers Petitioner's motion to vacate as it relates to his conviction for obstruction of justice only. Petitioner, however, presents no viable grounds for relief on this claim. He claims that "[h]ad defense counsel presented evidence creating a reasonable doubt about the government's theory that the STS Transfers were not loans, such evidence would have defeated all of the counts of the indictment." [CV Doc. 2 at 2-3]. Petitioner, however, does not show how this evidence would have defeated the obstruction of justice charge in particular. [See id. at 2-9]. And Petitioner's allegations are too vague and conclusory to warrant further examination. See United States v. Dyess, 730 F.3d 354, 359-60 (4th Cir. 2013) (holding it was proper to dismiss § 2255 claims based on vague and conclusory allegations), cert. denied, 135 S. Ct. 47 (2014). Moreover, as more fully address below, Petitioner's counsel's performance was not deficient in any event.

As such, the Court will deny and dismiss Petitioner's § 2255 motion to vacate as to all counts.

**B.     Coram Nobis**

Relief under the writ of coram nobis, on the other hand, is available only when a petitioner is no longer in custody for the challenged conviction(s). Here, Petitioner seeks relief through this writ on his convictions on Counts One through Three for which he is no longer in custody. Because

it is determinative, the Court looks directly to the fourth element of a coram nobis claim, that "the error is of the most fundamental character."

Petitioner argues that he is entitled to coram nobis relief because his trial counsel was ineffective. [CV Doc. 3 at 15]. Specifically, Petitioner argues that he received ineffective assistance because his trial counsel failed "to present material and substantial testimonial evidence supporting the defense that the subject funds were nontaxable loans and not income" and "that no or a minimal tax was due for the years at issue." [Id. at 16, 20]. Petitioner claims that such evidence could have been shown through the testimony of Petitioner's brother, Phillip Sutherland, and an accounting and tax expert, such as Michelle Frazier, Petitioner's expert at sentencing. [Id. at 16-23]. Petitioner, however, fails to establish any error let alone one of fundamental character.

As to his brother's testimony, Petitioner contends Phillip would have testified that, despite having no education, training, or experience in bookkeeping or accounting, he was the bookkeeper for Petitioner's companies, including Innovation Partners. [CV Doc. 1 at 20]. Petitioner asserts that Phillip would have admitted making numerous mistakes and omissions in QuickBooks. [Id.]. Phillip would have testified that he used the name "Phillip Augustus," rather than Phillip Sutherland in work matters to avoid having the same email address as Petitioner. [Id. at 21]. Phillip would have testified to his sister Beverly's "savvy business acumen," her having owned a restaurant in a shopping plaza in Jamaica before 2008, and him having observed her living in a nice house in 2013. [Id.]. Petitioner also contends that Phillip would have testified to what Jones knew, what he overheard Petitioner and Stewart discussing, and what Petitioner and his sister-in-law told him.[3] [Id. at 20]. As to expert testimony, Petitioner contends that a tax and accounting expert "would have provided evidence that (1) approximately half of the source of the STS

---

[3] Petitioner did not provide an affidavit from his brother, Phillip, attesting to the expected testimony.

Transfers were the STS Line of Credit Funds that such expert would have characterized as loans to Sutherland and (2) because of untaken deductions, there was no or de minimis taxes due for the years in question." [CV Doc. 3 at 19]. Petitioner also asserts that his attorney failed to adequately investigate the deductions reflected in Petitioner's tax returns and that, if counsel had so investigated, counsel could have presented evidence of the nature and amount of untaken deductions at trial through an expert like Frazier. [Id. at 21-22].

Petitioner claims that the failure to present testimony by Phillip and a tax and accounting expert constituted deficient performance and prejudiced Petitioner "because it deprived the jury of evidence relevant to the key issue at trial – whether the funds at issue were loans or income," thus, plainly "undermin[ing] confidence in the outcome." Strickland, 466 U.S. at 694.

Assuming for the sake of argument that Phillip would have testified as offered and that such testimony was admissible, Petitioner cannot show deficient performance or prejudice. Petitioner's attorney prepared Phillip for trial. After hearing the Government's evidence, counsel decided not to call Phillip as a witness. This decision was well within the bounds of reasonable professional assistance. There were risks incident to calling Phillip, including being cross-examined on his grand jury testimony. Moreover, Phillip's purported testimony would have emphasized his numerous bookkeeping errors, except as to Innovation Partners, the one company that had to be audited. This would have highlighted either Petitioner's knowledge of Phillip's errors or his willful blindness to them. Finally, given the evidence of fraudulent documents associated with Stewart's name, evidence from another of Petitioner's relatives would not likely have favorably impressed the jury.

Petitioner also fails to show deficient performance or prejudice regarding the failure to call an accounting expert at trial. Petitioner points to Frazier's testimony at sentencing to support

17

Case 3:21-cv-00082-MOC   Document 15   Filed 09/10/21   Page 17 of 20

what could have been shown at trial. The Federal Rules of Evidence, however, do not apply at sentencing hearings and there is a substantial question regarding whether Frazier's testimony would have been admissible at trial. See Fed. R. Evid. 703; United States v. Slager, 912 F.3d 224, 235 n.4 (4th Cir. 2019). Frazier admitted that she did not have records for all of Petitioner's accounts and that her findings of large unclaimed business expenses relied on evidence from Petitioner which was not supported by itemized receipts. Her calculations were based on hypothetical recharacterizations and shifting money to different entities. Ultimately, Frazier's testimony was insufficient to sway the Court at sentencing, in any respect, and the Court found that the self-reported information from Petitioner was not reliable. Petitioner seems also to ignore the risks that were associated with presenting tax expert testimony at trial, a risk that was born out at sentencing where Frazier's testimony was undermined. The jury could have easily seen such testimony as reflecting more evidence of intentional mischaracterization of income and expenses. Petitioner's counsels' decision not to present such testimony was well within the bounds of reasonable professional assistance.

Moreover, Petitioner's assertion that his attorney failed to adequately investigate the accounting before trial is speculative and unsupported by the record. The record shows that defense counsel was familiar with the relevant transactions and employed generalizations to support the defense that the books were messy and, thus, mistakes were less evident. This approach evidences a strategic means of casting doubt on intent.

Petitioner also fails to show prejudice. Even if an expert had testified at trial, at best, the expert would have testified that Petitioner's tax returns were not accurate and that he owed less money in taxes than shown by the Government. Evidence that Petitioner still owed a significant amount of money in taxes to the IRS does show that the result of these proceedings was

18

fundamentally unfair or unreliable. Sexton, 163 F.3d at 882. Petitioner, therefore, has not shown an error of the most fundamental character. He is not entitled to relief under coram nobis.[4]

## IV. CONCLUSION

For the foregoing reasons, the Court denies Petitioner's § 2255 motion to vacate, denies Petitioner's petition for writ of coram nobis, and grants the Government's motion to dismiss.

The Court further finds that Petitioner has not made a substantial showing of a denial of a constitutional right. See generally 28 U.S.C. § 2253(c)(2); see also Miller-El v. Cockrell, 537 U.S. 322, 336-38 (2003) (in order to satisfy § 2253(c), a "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong") (citing Slack v. McDaniel, 529 U.S. 473, 484-85 (2000)). Petitioner has failed to demonstrate both that this Court's dispositive procedural rulings are debatable, and that the Motion to Vacate states a debatable claim of the denial of a constitutional right. Slack v. McDaniel, 529 U.S. at 484-85. As a result, the Court declines to issue a certificate of appealability. See Rule 11(a), Rules Governing Section 2255 Proceedings for the United States District Courts, 28 U.S.C. § 2255.

### O R D E R

**IT IS, THEREFORE, ORDERED** that:

1. Petitioner's Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255 [Doc. 1] is **DENIED**;

2. Petitioner's Petition for Writ of Coram Nobis [Doc. 3] is **DENIED**;

3. The Government's Motion to Dismiss [Doc. 9] is **GRANTED**;

4. Petitioner's Motion to Strike the Government's Surreply [Doc. 12] is **DENIED**; and

---

[4] Because Petitioner has not shown such an error, the Court declines to address the other elements required for coram nobis relief.

5. Pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 Cases, this Court declines to issue a certificate of appealability.

**IT IS SO ORDERED**.

Signed: September 10, 2021

Max O. Cogburn Jr
United States District Judge